David Junior BROWN, Petitioner,

v.

Nathan A. RICE, Warden, Central Prison, Raleigh, North Carolina, Respondent.

No. C–C–87–0184–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 16, 1988.

Bruce T. Cunningham, Jr.; Pollock, Fullenwider, Cunningham & Patterson, Southern Pines, N.C., for petitioner.

Richard N. League, Jean Benoy, Sr. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for respondent.

## ORDER

McMILLAN, District Judge.

### TABLE OF CONTENTS

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 384 |
| I. THRESHOLD DUE PROCESS ISSUE | 385 |
| II. CLAIMS RELATING TO PRETRIAL MATTERS | |
| A. The trial court's denial of defense counsel's requests to see the crime scene did not violate petitioner's right to due process. | 386 |
| B. The court's refusal to appoint a psychologist to assist in petitioner's defense did not violate petitioner's due process rights. | 387 |
| C. The failure of the court to allow petitioner to question officers about the substantive nature of the State's investigation did not violate petitioner's constitutional rights | 388 |
| D. The court did not improperly restrict petitioner's right to the discovery of exculpatory information. | 388 |

III. CLAIMS RELATING TO JURY SELECTION

Page

A. The prosecutor's use of peremptory challenges to systematically exclude all potential jurors who expressed reservations about the death penalty produced a jury that was uncommonly willing to condemn a man to die and thereby violated petitioner's Sixth and Fourteenth Amendments right to be tried by an impartial jury........ 389

B. The trial court's refusal to impanel a second jury to hear the sentencing phase of petitioner's capital murder trial did not violate due process. .... 394

IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.................... 394

A. Defense Attorney Griffin violated petitioner's Sixth Amendment right to effective assistance of counsel when he conceded during the sentencing proceeding, without petitioner's knowledge or approval, and despite petitioner's claim of innocence, that in fact petitioner committed the crimes alleged. ........... 395

B. Petitioner received ineffective assistance of counsel when counsel conceded the existence of aggravating factors without petitioner's consent................................. 397

C. Counsel's presentation of alternative theories of defense was sound trial stategy............................ 398

D. The state did not render defense counsel ineffective as a matter of law. ............................. 398

V. CLAIMS RELATING TO THE PENALTY PHASE........................... 398

VI. OTHER CLAIMS ........................ 399

VII. CONCLUSION........................... 399

## PRELIMINARY STATEMENT

On September 29, 1980, David Junior Brown was indicted by the Grand Jury of Moore County, North Carolina, on two counts of first degree murder. He entered pleas of not guilty on both counts. On November 6, 1980, both cases were transferred from the Superior Court of Moore County to the Superior Court of Union County for trial. Petitioner was tried before a jury beginning on December 8, 1980, in the Union County, North Carolina Superior Court, Monroe, North Carolina, with Judge Julius Rousseau presiding. The guilt-innocence phase of the capital murder trial ended ten days later on December 18, 1980, when the jury returned its verdicts finding the petitioner guilty as charged on both counts of first degree murder.

The sentencing phase began December 19, 1980, and continued into the following day. On December 20, 1980, the jury returned with its sentencing recommendation. The jury found the existence of two aggravating circumstances that were sufficiently substantial to call for the imposition of the death penalty, and the existence of six mitigating circumstances. The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and pursuant to the court's instructions that if they so found "... it would be your [sic] duty to recommend that the defendant be sentenced to death ...," (Record at 1776), the jury recommended that the petitioner be sentenced to death on both counts of first degree murder. Judge Rousseau entered judgment imposing the death penalty for each of the crimes committed and setting petitioner's execution date for February 13, 1981.

On January 23, 1981, petitioner received a stay of execution, pending appeal to the Supreme Court of North Carolina. On July 13, 1982, the Supreme Court of North Carolina affirmed the convictions and declined to set aside the death sentences imposed. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569 (1982). Petitioner received a stay of execution pending his petition for a writ of certiorari to the Supreme Court of the United States. Certiorari was denied on December 6, 1982, and petitioner was given a new execution date of March 16, 1984. *Brown v. North Carolina*, 459 U.S. 1080, 103 S.Ct. 503, 74 L.Ed.2d 642 (1982).

The North Carolina Supreme Court stayed the petitioner's execution and on March 29, 1984, ordered that counsel be appointed for petitioner to file a motion for appropriate relief. Petitioner filed a motion for appropriate relief on July 16, 1984, alleging in pertinent part, (1) claims relating to the state's use of their peremptory challenges and (2) ineffective assistance of counsel. The motion was heard before the Honorable William H. Helms, on October 3, 1984, and was denied in its entirety on March 28, 1985. On June 15, 1985, petitioner filed a motion to reopen the hearing on the Motion for Appropriate relief, alleging that Judge Helms violated petitioner's due process rights when he engaged in *ex*

*parte* communications with the District Attorney's office. The motion to reopen the hearing was denied on September 19, 1985.

On June 3, 1986, the North Carolina Supreme Court denied petitioner's petition for certiorari to review denial of the motion for appropriate relief, and certiorari was denied by the United States Supreme Court on November 3, 1986. *Brown v. North Carolina,* 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986). On March 4, 1987, on motion by the State, the Superior Court entered an order setting a May 8, 1987, execution date for petitioner.

On April 17, 1987, petitioner filed his petition for habeas corpus with this court, and on April 21, 1987, a stay of execution was entered. The state has answered and moved to dismiss. The state has waived the exhaustion requirement, *Sweezy v. Garrison,* 694 F.2d 331 (4th 1982); however, the state pleads that "in a death case, the combination of exhausted and nonexhausted claims in a single writ constitutes an abuse of the writ which requires rejection of the unexhausted claims on the basis of abuse." State's answer at 5.

The state wants to avoid delay by waiving the exhaustion requirement but then have the court penalize the petitioner for not exhausting by dismissing the unexhausted claims as an abuse of the writ. The fact that this is a death case makes it deserving of more procedural safeguards, not less. "Abuse of the writ" doctrine applies to delayed and successive petitions; this petition is neither. The court declines to dismiss the unexhausted claims as an abuse of the writ.

After reviewing all the evidence, pleadings and briefs in the record, the court concludes that the judgment of the North Carolina Supreme Court, insofar as it imposes the death sentence, should be reversed; and the case is remanded to that court for further proceedings not inconsistent with this opinion.

## I

## THRESHOLD DUE PROCESS ISSUE

■ Petitioner contends that the series of *ex parte* communications between Judge Helms and the District Attorney's office during the drafting of Judge Helms' order denying petitioner's motion for appropriate relief violated his due process rights guaranteed by the Fourteenth Amendment.

Petitioner alleges that the *ex parte* communications consisted of (1) Judge Helms asking the administrative assistant for the District Attorney's office to type, from a tape recording of his dictation, the first draft of an order denying petitioner's motion for appropriate relief; (2) soliciting comments from the District Attorney on the proposed order without notifying or making the same request of defense counsel; (3) incorporating the District Attorney's suggestions into the final order denying petitioner's motion; and (4) having the administrative assistant for the District Attorney's office type up the final order. Defense counsel did not learn of these communications until some time in June of 1985, after the March 28, 1985, final order was filed by the court.

On June 15, 1985, petitioner filed a motion to reopen the motion for appropriate relief asserting that these *ex parte* communications violated his constitutional right to due process. On August 26, 1985, Judge Freeman presided over an evidentiary hearing on petitioner's motion to reopen the motion for appropriate relief. The only person who testified at the hearing was Assistant District Attorney James Webb. Mr. Webb did not have personal knowledge of the conversations that took place between Judge Helms and the administrative assistant, Ms. Carriker. The relevant factual findings that arose out of the evidentiary hearing are that "the proposed order was typed by Pam Carriker, the District Attorney's Administrative Assistant, at the request of Judge Helms, ... that the Assistant District Attorney, Mr. Webb, reviewed the proposed order and shortly thereafter wrote Judge Helms a letter suggesting two or three points for his consideration, ... [that] the second proposed order [which incorporated Mr. Webb's suggestions] was typed by Ms. Carriker at the request of Judge Helms, ... [and] that no

copies of either proposed order were sent to the defendant or his attorney." Appendix A at 83–84. The Court also found "that it is not an unusual practice for the District Attorney's Office to type orders for a presiding judge," and concluded that none of the petitioner's rights under the North Carolina General Statutes, or the North Carolina State Constitution, or the United States Constitution had been violated.

The constitutional problem with Judge Helms' conduct is not that he received clerical help from the District Attorney's office or that he incorporated the District Attorney's suggestions into his final order, *see Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 571, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985), but that he did so *without notifying defense counsel.* The not so unusual practice of presiding judges obtaining clerical assistance from the District Attorney's office creates an appearance of impropriety; when that practice is accomplished by *ex parte* communications between the judge and the district attorney's office, the impropriety is no longer apparent, but real.

Petitioner argues that the *ex parte* communications between Judge Helms and the District Attorney's office deprived him of his constitutional right to be heard by an impartial adjudicator. *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). "A judge should ... neither initiate nor consider *ex parte* or other communications on the merits or procedures affecting the merits of a pending or impending proceeding." Code of Judicial Conduct, Canon 3 A(4). "When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain,* 464 U.S. 114, 119, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983). The consequence of the nondisclosure depends on the substance of the *ex parte* communications and their effect on the judge's impartiality. *Rushen* at 120, 104 S.Ct. at 456. The substance of the *ex parte* communications and their effect on the judge's impartiality are questions of historical fact. *Rushen* at 120, 104 S.Ct. at 456. Accordingly, the factual findings arising out of the state court's hearing on petitioner's motion to reopen the motion for appropriate relief are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d).

As discussed above, the factual findings from the evidentiary hearing on petitioner's motion to reopen the motion for appropriate relief are that the gist of the *ex parte* communications between Judge Helms and the District Attorney's office consisted of Judge Helms asking for clerical assistance and Assistant District Attorney Webb suggesting that findings covering four issues were missing from the proposed order and should be included. Appendix A at 83–84.

A review of the transcript from the motion for appropriate relief (Appendix D) and a comparison of the first and final drafts of Judge Helms' order, reveals that petitioner received a fair consideration of his claims and all the process that he was due. Contrary to petitioner's contention, we find that the *ex parte* communications were relatively innocuous and the nondisclosure harmless beyond a reasonable doubt. *See Rushen,* at 120, 121, 104 S.Ct. at 457, citing *Chapman v. California,* 386 U.S. 18, 20–21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967).

## II

### CLAIMS RELATING TO PRETRIAL MATTERS

A. *The trial court's denial of defense counsel's requests to see the crime scene did not violate petitioner's right to due process.*

■ Petitioner maintains that the trial court and the District Attorney interfered with defense counsel's ability to investigate critical factual issues by refusing to allow counsel to view the crime scene, and thereby deprived him of his right to due process. "Due process guarantees that a criminal defendant will be treated with that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair tri-

al." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1981).

On direct appeal the North Carolina Supreme Court found that under the facts of this case, including the state's heavy reliance on information gained from the crime scene to prove its case against the defendant, "... it was a denial of fundamental fairness and due process for defendant to be denied under police prosecutorial supervision, a limited inspection of the premises of the crime scene." *State v. Brown*, 306 N.C. at 163–164, 293 S.E.2d 569. However, the court went on to apply the harmless error standard and concluded that the overwhelming evidence of petitioner's guilt rendered the constitutional error harmless beyond a reasonable doubt. *Brown* at 165, 293 S.E.2d 569.

Petitioner's right to inspect the scene of the crime falls within the genre of "what might loosely be called the area of [cases establishing a] constitutionally guaranteed access to evidence." *United States v. Valenzuela–Bernal*, 458 U.S. at 867, 102 S.Ct. at 3446. The standard of review in nondisclosure of evidence cases is that such nondisclosure constitutes constitutional error and requires reversal of the conviction only if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Had petitioner's counsel been allowed to view the crime scene he may have become slightly better informed, but what he would have found there would have been what the North Carolina State Supreme Court described as overwhelming evidence of petitioner's guilt.

"Our reading of the record here leaves no doubt that the trial court's error was harmless. This is so because evidence of this defendant's guilt was overwhelming. A ring identified as one previously worn by defendant was found in the body of Ms. Chalflinch. A bloody palm print lifted from the bedroom wall of the apartment was unquestionably indentified as being that of the defendant. A bloody and broken knife blade similar to ones owned by defendant and used by him in his work was found at the crime scene. In addition to the blood at the crime scene, blood was located at the entrance of defendant's apartment and throughout the apartment." *Brown*, 306 N.C. at 164–165, 293 S.E.2d 569.

Not only is there no reasonable probability that defendant's inspection of the crime scene would have changed the outcome of the proceedings, but we are convinced, as was the North Carolina Supreme Court, that the state's error of depriving petitioner's counsel access to the crime scene was harmless beyond a reasonable doubt in light of the overwhelming evidence of petitioner's guilt.

Regardless of which standard is applied, the constitutional error of not allowing petitioner's counsel access to the crime scene does not warrant a reversal of petitioner's conviction. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (The confession of a co-defendant who did not testify was admitted at the defendant's trial in violation of the defendant's rights under the Sixth Amendment's confrontation clause, but the error was held "harmless beyond a reasonable doubt" due to the overwhelming evidence of defendant's guilt).

B. *The Court's refusal to appoint a psychologist to assist in petitioner's defense did not violate petitioner's due process rights.*

"When a[n indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1984).

At a pretrial hearing on October 29, 1980, defense counsel moved for the appointment of a psychiatrist to assist with trial preparation, and in particular for the

388

sentencing phase of trial if that became necessary. In support of the motion counsel told Judge Rousseau that petitioner did not remember what happened between 4:00 a.m. and 7:30 a.m. on the day of the crime. The motion was denied.

On November 14, 1980, defense counsel renewed his motion for the appointment of a psychiatrist and the motion was ALLOWED. *See* November 14 motions hearing transcript at 50–52. Nothing in the record suggests that the motion was later reconsidered and denied or that despite the granting of the motion no one was in fact appointed to assist the defendant. Accordingly, this claim is dismissed.

C. *The failure of the court to allow petitioner to question officers about the substantive nature of the State's investigation did not violate petitioner's constitutional rights.*

■ At the pretrial motions hearing on October 27, 1980, counsel moved for the appointment of a variety of experts (*e.g.,* investigator, criminologist) to assist with trial preparation. Petitioner offered evidence in support of the motion from Joel W. Morris and Don Davis, two of the state's police investigators assigned to the Chalfinch murder investigation. The judge allowed counsel to ask questions about the number of investigators assigned to the case and how many hours they spent doing their investigation; the number of lab technicians and chemists assigned to the case, what they studied, and how many hours they spent doing their forensic studies; and other general questions about the mechanics of the investigation. The judge sustained objections to questions that asked about the substance and results of the investigation.

The trial court is afforded wide discretion in determining the scope of appropriate questions and admissible evidence. *See U.S. v. Heyward,* 729 F.2d 297 (4th Cir. 1984). The court did not abuse its discretion when it limited the scope of questioning and evidence *at the pre-trial motions hearing* to questions about the volume and mechanics of the state's investigation.

D. *The court did not improperly restrict petitioner's right to the discovery of exculpatory information.*

Petitioner contends that the court violated his rights under the Sixth, Eighth and Fourteenth Amendments by (1) denying his motion for a recess to evaluate newly discovered information, and (2) refusing to allow defense counsel to inquire into knowledge by the police officers of witnesses who may have seen the victims alive after 1:00 a.m.

■ As to the first assertion, the "newly discovered information" consisted of a witness' statement that a blonde-headed white male (petitioner is a black male) had been seen jumping from the balcony of the victim's apartment on the night of the murder. After learning of this newly discovered witness statement the trial court conducted a voir dire of the two police officers who took the statement from the witness. The officers explained that they discounted the witness' statement because after viewing the apartment complex the witness said he saw a man jump from the balcony of an apartment that was adjacent to the victim's. At the conclusion of the voir dire the trial court found that (1) the District Attorney did not learn of the witness' statement until trial; (2) the defense counsel learned through independent means of the witness' statement a week before trial and had in fact talked with the witness before trial; and (3) the District Attorney had not intentionally tried to hide any information from the defendant. Record at 538–540.

On direct appeal the North Carolina Supreme Court concluded that the trial court's findings of fact were fully supported by the evidence and the manner in which the court dealt with the newly discovered information was within its discretion. *Brown,* 306 N.C. at 167, 293 S.E.2d 569. I agree. On these facts it is apparent that the court's ruling on defendant's request for a continuance did not deny petitioner of the opportunity to develop exculpatory evidence. Not only had petitioner begun to develop this exculpatory evidence

a week before the state made its disclosure to the court, but the witness, Mike Pagan, was called by the defendant as his last witness. Pagan testified to the same story he told the police—that he saw a blond-headed white male jump from the balcony of an apartment that was adjacent to the victim's apartment. *See also United States v. Smith Grading and Paving, Inc.,* 760 F.2d 527 (4th Cir.1985) (There is no due process violation if *Brady* material is disclosed in time for effective use at trial).

■ Petitioner also contends that the court's refusal to allow defense counsel to inquire into Sergeant Davis' knowledge about who might have seen the victim after 1:00 a.m. on Monday, August 25, 1980, interfered with his ability to develop exculpatory evidence. The defendant proferred a statement from a witness in support of this line of questioning. The trial court reviewed the statement *in camera* (this statement is not part of the record), determined that it was not exculpatory, and sustained the state's objection to the line of questioning. Although the petitioner was unable to get the information he desired out of the testifying police officer, he got the evidence before the jury through the live testimony of the author of the *in camera* statement, Clarence Harding.

To the extent that the trial court's ruling might have interfered with petitioner's ability to develop exculpatory evidence, the petitioner was not in any way prejudiced or deprived of his due process rights.

## III

### CLAIMS RELATING TO JURY SELECTION

A. *The prosecutor's use of peremptory challenges to systematically exclude all potential jurors who expressed reservations about the death penalty produced a jury that was uncommonly willing to condemn a man to die and thereby violated petitioner's Sixth and Fourteenth Amendments right to be tried by an impartial jury.*

In all first degree capital murder cases where the defendant faces the possibility of a death sentence if convicted, the court must "death qualify" the jury, *i.e.,* determine during the jury selection, based on answers to questions asked of the prospective jurors by the state, the defendant, and the court, whether any of them have views about the death penalty that would impair their ability to serve as jurors.

During the jury selection in this case, the state used the voir dire to determine if prospective jurors had *any* feelings about the death penalty and then excused by peremptory challenge "all jurors who indicated the slightest uncertainty about the death penalty." *Brown v. North Carolina,* 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986) (Brennan, J., dissenting from denial of certiorari).

Q: Mrs. Griffin, you have been sitting there and thinking about, if you need to, I don't know whether you have or not, do you believe in capital punishment?

A: I have been thinking about it, in most cases, yes sir.

Q: Would it be fair to say—I don't want to put words in your mouth, let me rephrase that, are you apprehensive about your role as you sit there at this time knowing the issues at hand?

A: No sir, I feel I could fairly judge on the issues of the courtroom. Record at 86.

\* \* \* \* \* \*

Q: Mr. Caudle, as you sit there, as Mrs. Griffin said she had, have you been thinking about whether or not you believe in capital punishment?

A: Yes, sir.

Q: Do you or not?

A: In some cases.

Q: In some cases?

A: No answer.

Q: Would some of those cases involve the offense of murder in the first degree?

A: Yes. Record at 88.

\* \* \* \* \* \*

Q: [Mrs. Smith] Do you believe in capital punishment in some cases?

A: Yes, sir, I do.

Q: Have you ever believed otherwise?

A: I suppose as—when I was much younger, I probably did. I have given a lot of thought, but I do believe in capital punishment, certain consideration.

Q: If the evidence and the law requires it, your consideration of that, I should put it, if under the evidence and the law it becomes your duty to seriously give consideration to returning with a decision that means the defendant will be sentenced to death, can you seriously and conscientiously do that if the evidence and law so warrants?

A: Yes, sir.

Mr. Lowder: The State will excuse with our thanks Mrs. Griffin, Mr. Caudle and Mrs. Smith. Record at 90.

In total, the state used its peremptory challenges to excuse *all of the nine* potential jurors who expressed some reservations about the use of capital punishment. The state concedes that none of these nine jurors could have been excused for cause because all of them said they could put their personal feelings aside and apply the law as instructed by the judge.

Petitioner contends that the state's use of its peremptory challenges to cull from the jury everyone who expressed some opposition to the death penalty deprived him of his constitutional right to be tried by an impartial jury. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1967). The State contends that the prosecution may exercise its peremptory challenges to remove jurors not in favor of the death penalty based on its "view concerning the outcome of the case to be tried" and that because the prosecution's use of the peremptories does not involve an equal protection question, *see Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1988), there is no merit to petitioner's claim. This issue has been discussed as dictum in some of the most recent decisions of the United States Supreme Court but has never been ruled on. *See Gray v. Mississippi,* — U.S. —, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (Capital defendant's constitutional right to an im-partial jury prohibits exclusion for cause of venire members simply because they express general objections to the death penalty and is not subject to harmless error analysis), and *Ross v. Oklahoma,* — U.S. —, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (Oklahoma law that use by capital defendant of peremptory challenges to cure erroneous denials of challenges for cause did not violate the Fourteenth Amendment's Due Process Clause by arbitrarily depriving the defendant of a full complement of peremptory challenges).

The Sixth and Fourteenth Amendments guarantee to a criminal defendant a fair trial by a panel of impartial jurors. *See Irwin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1659, 6 L.Ed.2d 751 (1961). Due process is denied by circumstances creating the "likelihood or appearance" of bias, *Peters v. Kiff,* 407 U.S. 493, 502, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972), and "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed.2d 942 (1955).

The seminal United States Supreme Court case regarding the capital defendants' rights to an impartial jury is *Witherspoon v. Illinois.* At issue in *Witherspoon* was an Illinois statute that provided, "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." *Witherspoon* at 512. This statute not only excluded for cause jurors who stated that they could never impose the death penalty or jurors who stated that their reservations about capital punishment would prevent them from making an impartial decision as to defendant's guilt, but it also provided for the automatic exclusion of anyone who "indicated that they had conscientious scruples against inflicting [the death penalty.]" The court held that a capital defendant's right under the Sixth and Fourteenth Amendments to an impartial jury prohibited the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed consci-

entious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522, 88 S.Ct. at 1777. The court explained that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Witherspoon* at 519, 88 S.Ct. at 1775. The court rejected the notion that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction, but readily acknowledged that such a jury would taint the penalty phase proceedings and be much more likely to return a sentence of death than a sentence of life imprisonment.

"If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die.

It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' (Citations omitted.) It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon* at 520–521, 88 S.Ct. at 1776.

The state's power to challenge for cause prospective jurors in capital murder cases "does not extend beyond its interest in removing those jurors who would 'frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.'" *Gray v. Mississippi,* — U.S. at ——, 107 S.Ct. at 2051, citing *Wainwright v. Witt,*

469 U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985). As a result of *Witherspoon* and its progeny, "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt* at 424, 105 S.Ct. at 852. Prospective jurors who are excused for cause because they meet this standard are referred to as "Witherspoon-excludables."

█ In this case the state went beyond the "Witherspoon-excludables" and used its peremptory challenges to remove every prospective juror who expressed some uncertainty about capital punishment. The state accomplished, through its use of peremptory challenges, what it could not constitutionally do through challenges for cause, i.e., "stack the deck against the petitioner." *Witherspoon*, 391 U.S. at 523, 105 S.Ct. at 1778.

I respectfully disagree with the assertion made by Justice O'Connor in her concurring opinion denying petitioner's petition for writ of certiorari to the Supreme Court of North Carolina, *Brown v. United States*, 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986), that "[p]ermitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon*." *Brown* at 941, 107 S.Ct. at 424. Permitting prosecutors to excuse peremptorily every prospective juror who expresses some reservation about capital punishment directly implicates the concerns expressed in *Witherspoon*. *Witherspoon* did not turn on the fact that jurors were excused for cause; *Witherspoon* turned on the fact that the resulting jury, "[c]ulled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty [would be] a jury uncommonly willing to condemn a man to die, ... a tribunal organized to return a verdict of death." *With-*

erspoon, 391 U.S. at 520–521, 88 S.Ct. at 1776. The ultimate outcome of a jury organized to return a verdict of death is no less partial when achieved through peremptory challenges than when achieved through challenges for cause; the violation of the sixth amendment's guarantee of an impartial jury is just as unconstitutional.

The extent to which this case implicates the concerns expressed in *Witherspoon* is what distinguishes this case from *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1985). In *Lockhart v. McCree* petitioner contended that removal for cause of the "Witherspoon-excludable" jurors from the *guilt-innocence phase* of his capital murder trial violated the fair cross section requirement of the Sixth Amendment and his constitutional right to be tried by an impartial jury.

The court rejected the fair-cross section argument, finding that groups defined solely in terms of shared attitudes, such as "Witherspoon-excludables," are not "distinctive groups" for fair cross-section purposes. *McCree* at 173–177, 106 S.Ct. at 1764–67. The court also rejected McCree's impartial jury claim and his contention that *Witherspoon* stood for the proposition "that a State violates the constitution whenever it 'slants' the jury by excluding a group of individuals more likely than the population at large to favor the criminal defendant." *McCree* at 179, 106 S.Ct. at 1767. The court distinguished McCree's claim from *Witherspoon* on two grounds. "First, the court in *Witherspoon* viewed the Illinois system as having been deliberately slanted for the purpose of making the imposition of the death penalty more likely." *McCree* at 179, 106 S.Ct. at 1768. In *McCree*, the Witherspoon-excludable jurors were not removed so as to tilt the scales deliberately in favor of the State, but were removed so as to *comply* with the mandate of *Witherspoon* and accomplish "the State's entirely proper interest in obtaining a single jury that could impartially decide all issues in McCree's case." *McCree* at 180, 106 S.Ct. at 1768. "Second, and more importantly, ... *Witherspoon* ... dealt with the special context of capital sentencing, where the range of jury discretion

necessarily gave rise to far greater concern over the possible effects of an 'imbalanced' jury." *McCree* at 182, 106 S.Ct. at 1769. McCree's impartial jury claim did not pertain to the special context of capital sentencing, but rather, went to the jury's more traditional role of determining his guilt or innocence. The court refused to extend *Witherspoon* to the guilt or innocence trial, concluding that "... the Constitution presupposes that a jury selected from fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *McCree* at 184, 106 S.Ct. at 1770.

Unlike McCree, petitioner Brown's claim deals with the special context of capital sentencing and asks whether the prosecution's use of its peremptory challenges to excuse not only the "Witherspoon-excludables" but *all* the prospective jurors who expressed even the slightest reservations about capital punishment violated his right to an impartial jury.

The Supreme Court of the United States concluded in *Witherspoon*, that a state may not entrust the determination of whether a man should live or die to a jury that had been swept of all potential jurors who expressed opposition to the death penalty. Petitioner Brown is simply asking the court to reaffirm the principles of *Witherspoon* and hold that the State cannot achieve through its use of peremptory challenges what for cause is prohibited under *Witherspoon*.

 The peremptory challenge is not exempt from scrutiny under the Sixth Amendment. "The prosecutor's historical privilege of peremptory challenge free of judicial control," *Batson v. Kentucky*, 476 U.S. 79, 91, 106 S.Ct. 1712, 1720, 90 L.Ed.2d 69 (1987), is an important right for the state as well as the accused, but it is certainly no more important than the accused's Sixth and Fourteenth Amendment rights to be tried by an impartial jury. The Supreme Court has repeatedly recognized,

and recently reiterated, that *"peremptory challenges are a creature of statute and are not required by the constitution."* [Emphasis added.] *Ross v. Oklahoma,* 108 S.Ct. at 2279. Where a constitutional right comes into conflict with the statutory right of peremptory challenges the constitutional right prevails. *See Gray v. Mississippi,* — U.S. at ——, 107 S.Ct. at 2053–55.

The prosecution's statutory right to exercise peremptory challenges gave way to the constitution in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the prosecutor used his peremptory challenges to strike all four black persons on the venire. The Supreme Court held that "[a]lthough a prosecutor ordinarily is entitled to exercise peremptory challenges 'for any reason, as long as that reason is related to his view concerning the outcome' of the case to be tried (citation omitted), the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson* at 89, 106 S.Ct. at 1719. "The implication of the State's position [in this case] is that it is free to use its peremptory challenges to violate any constitutional command other than the Equal protection Clause." *Brown v. North Carolina,* 479 U.S. at 944, 107 S.Ct. at 426. I respectfully disagree.

The *Batson* holding cannot mean that the state is prohibited from using its peremptories for racial reasons but permitted to use its peremptories for other unconstitutional reasons so long as the unconstitutional reasons are related to the prosecutor's views concerning the outcome of the case to be tried. The peremptory challenge has traditionally been viewed as a necessary and integral means for assuring that our trial by jury system affords the parties the process they are due. "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the per-

emptory satisfies the rule that 'to perform its high function in the best way "justice must satisfy the appearance of justice." ' " *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1964), citing *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1954).

When used properly, "[peremptory challenges] are the means to achieve the end of an impartial jury," *Ross v. Oklahoma,* 108 S.Ct. at 2278, when used improperly to exclude all jurors who indicate even the slightest uncertainty about the death penalty, they become the means for violating the constitution. "[T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon,* 391 U.S. at 521–522, n. 20, 88 S.Ct. at 1776–1777 n. 20. Excluding jurors who would be in the slightest way affected by the prospect of the death penalty, or by their views about such a penalty, tips the scales toward death and deprives the defendant of the impartial jury to which he or she is entitled. *See Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980). No defendant can constitutionally be put to death at the hands of a tribunal so selected. *See Witherspoon,* 391 U.S. at 522–523, 88 S.Ct. at 1777–78.

I conclude that it is unconstitutional for prosecutors to use peremptory challenges consistently to exclude potential jurors who express reservations about capital punishment so as to produce a jury that is uncommonly willing to condemn a man to death. *But see Gray v. Mississippi,,* — U.S. ——, 107 S.Ct. at 2062 (Justice Scalia dissenting, with whom the Chief Justice, Justice White and Justice O'Connor join).

To establish a prima facie Sixth Amendment violation the capital defendant must show that the prosecutor has exercised his peremptory challenges to remove from the venire all members who were non-Witherspoon excludables, i.e., opposed to the death penalty but able to uphold the juror's oath and abide by the law as is instructed by the court. The burden then shifts to the state to come forward with a neutral explanation for challenging the jurors. As in

*Batson,* "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause ... [b]ut the prosecutor may not rebut the defendant's prima facie case of [jury partiality] by stating merely that he challenged all the jurors ... on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their [convictions against the death penalty]." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

*Witherspoon* and its progeny are rooted in the Sixth and Fourteenth Amendments constitutional right to an impartial jury, a right which goes to the very integrity of our criminal justice system. If we were to allow the state to achieve through its use of peremptories what for cause is clearly prohibited under *Witherspoon* and its progeny, we would be rendering the capital defendant's right to an impartial jury meaningless, and sanctioning the abusive use of the peremptory challenge.

B. *The trial court's refusal to impanel a second jury to hear the sentencing phase of petitioner's capital murder trial did not violate due process.*

█ The United States Constitution permits the same jury to sit in both phases of a bifurcated capital murder trial. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1985).

North Carolina law only provides for separate juries to hear the two phases of a capital murder case "[i]f the trial jury is unable to reconvene for a hearing on the issue of penalty after having determined the guilt of the accused...." N.C.G.S. § 15A–2000(a)(2). Since the trial jury was able to reconvene and decide the penalty issue, the trial court's refusal to impanel a second jury was entirely appropriate and constitutionally permissible.

## IV

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Petitioner claims that he received ineffective assistance of counsel because (A) without petitioner's knowledge or consent counsel told the jury during the sentencing hearing that petitioner had committed the crimes as alleged; (B) without petitioner's knowledge or consent counsel conceded the existence of the two aggravating factors that the state had the burden of proving; (C) trial counsel presented inconsistent defenses; and (D) the state thwarted counsel's efforts to investigate the case. Each of these contentions must be analyzed using the two-prong test established by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1983), for deciding Sixth Amendment ineffective assistance of counsel claims:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland* at 687, 104 S.Ct. at 2064.

To demonstrate that counsel's assistance was ineffective "the defendant must overcome the presumption that under the circumstances the challenged action 'might be considered sound trial strategy' (citation omitted)," and show instead, that counsel's conduct did not comport with the "prevailing norms of practice" and thereby "fell below an objective standard of reasonableness." *Strickland* at 689–690, 104 S.Ct. at 2064–66.

"[I]n assessing the prejudice from counsel's errors ... [w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt re-

specting guilt. When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer —including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland* at 695, 104 S.Ct. at 2068–69.

A. *Defense attorney Griffin violated petitioner's Sixth Amendment right to the effective assistance of counsel when he conceded during the sentencing proceeding, without petitioner's knowledge or approval, and despite petitioner's claim of innocence, that in fact petitioner committed the crimes alleged.*

 Petitioner contends that Mr. Griffin "argued" to the jury at the sentencing trial without petitioner's knowledge or consent and despite petitioner's claim of innocence, that petitioner committed the crimes alleged. *E.g.:*

> "We are talking about what is going to happen to the man who did it, and that's all we're talking about." Record at 1745.

> "We are debating a man's—whether a man shall live or die, and regardless of what David Brown has done, he is a human being." Record at 1745.

> "He may have committed a horrible crime and he did commit two horrible crimes, but he is still a human being with a soul despite the blackness of the crime that this man has committed." Record at 1746.

> "All men became a living soul and that David Brown despite what he did became a living soul and is a living soul." Record at 1749.

> "We don't know why he did it, and I agree with Mr. Lowder, if you brought in a psychiatrist I seriously doubt that anyone could go into his mind and tell us why he did it." Record at 1752.

> "He never committed a violent act before that August 25, 1988." Record at 1761.

Attorney Griffin acknowledges that petitioner has never personally admitted his guilt to defense counsel or the court. Griffin does not particularly recall, but he seriously doubts that he discussed with petitioner the idea of making such an admission to the jury during the sentencing argument; "[A]s a general policy I do not discuss my jury arguments with my clients." The state concedes that Attorney Griffin "admitted" his client's guilt to the jury during the sentencing argument without petitioner's consent. State's answer at 20.

The state contends that Mr. Griffin's approach to the sentencing argument represented the honest approach to the jury and was a reasoned trial strategy, regardless of the fact that the "admission" was without Petitioner's consent. This argument obscures the fact that petitioner never admitted his guilt to anyone—not to counsel, and not to the court. What was presented to the jurors, and the state, as an admission of petitioner's guilt was in fact nothing more than attorney Griffin's opinion of the case. Cannon 7 (EC 7–24) of the Code of Professional Responsibility of the American Bar Association provides, "The expression by a lawyer of his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant or as to the guilt or innocence of an accused is not a proper subject for argument to the trier of fact."

Counsel violated the Code of Professional Responsibility and breached the duty of loyalty that he owed petitioner when, despite petitioner's protestations of innocence, counsel expressed his opinion to the jury that petitioner had "committed two horrible crimes." Record at 1746.

The state's contention that the "honest" approach to the jury was reasonable and therefore not ineffective assistance of counsel also confuses the issue. The state adopts the position taken by Judge Helms in his order denying petitioner's motion for appropriate relief that "Mr. Griffin's stating to the jury during the argument on sentencing that the defendant committed the crimes did not constitute ineffective assistance of counsel as the argument was

reasonable." Judge Helms reasoned that had counsel continued to maintain that petitioner was innocent despite the jury's verdict his argument would have made "a mockery of the jury" and "the jury may well have questioned the sincerity and credibility of counsel's argument in his efforts to save the life of his client." Appendix A at 76.

Hypothesizing about how the jury would have perceived a sentencing argument that did not include an admission of guilt is all well and good, but is irrelevant to the matter at hand. The wisdom and reasonableness of an attorney's conduct is not a shield to counsel's Sixth Amendment duty to advocate his client's position and to consult with the client about important decisions.

> "Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant and hence counsel owes the client a duty of loyalty ... From counsel's function as assistant to the defendant derives the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland* at 688, 104 S.Ct. at 2065.

These basic duties apply equally to the guilt-innocence trial and the capital sentencing proceeding. "A capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision (citations omitted), that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland* at 686–687, 104 S.Ct. at 2064.

While law and tradition allocate to counsel the right to make binding decisions of trial strategy in many areas, *Faretta v. CA*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the accused retains the ultimate authority to make certain fundamental decisions regarding the case such as whether to plead guilty, to testify in his or her own behalf, or take an appeal. *Jones v.* *Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

When counsel concedes a client's guilt during the guilt-innocence phase of trial in spite of the client's earlier plea of not guilty and without the defendant's consent, counsel provides ineffective assistance of counsel regardless of the weight of evidence against the defendant or the wisdom of counsel's "honest approach" strategy. *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir.1983); *Wiley v. Sowders*, 647 F.2d 642 (6th Cir.1981); *North Carolina v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985). The gravity of the consequences of a decision to plead guilty or to admit one's guilt demands that the decision remain in the defendant's hand. An attorney cannot deprive his or her client of the right to have the issue of guilt or innocence presented to the jury as an adversarial issue on which the state bears the burden of proof without committing ineffective assistance of counsel. "The adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate' (citation omitted). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *U.S. v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1983). A lawyer may make a tactical determination of how to run a trial, but the due process clause does not permit the attorney to enter a guilty plea or admit facts that amount to a guilty plea without the client's consent. *See Brookhart v. Janis*, 384 U.S. 1, 8, 86 S.Ct. 1245, 1249, 16 L.Ed.2d 314 (1966) (Harlan's concurrence.) Similarly, counsel cannot concedeto the jury and the state his or her client's guilt during the sentencing phase of a capital murder trial. Counsel may believe it tactically wise to stipulate to the criminal defendant's guilt once the jury renders its verdict on the guilt or innocence question, but the defendant's decision to plead not guilty and hold the government to proving its case for a death sentence at the penalty phase of the capital trial "must be honored out of that respect for the

individual which is the lifeblood of the law." *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) citing, *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

The state suggests that even if counsel's failure to consult with petitioner about whether to admit guilt during the sentencing argument was a serious error, it did not deprive petitioner of his Sixth Amendment right to effective assistance of counsel, because guilt was irrelevant at the sentencing hearing and, accordingly, the admission was not prejudicial. I disagree.

What transpired in the courtroom during the guilt-innocence trial was inextricably related to the sentencing decision. The jury was specifically instructed by the court to decide from all the evidence presented in *both phases of the trial* what the facts are and whether the facts warrant a recommendation of life imprisonment or the death penalty. Record at 1763–1764. Counsel's sentencing argument cast an aspersion on the credibility of all the witnesses who testified on behalf of petitioner's innocence, and undoubtedly removed that evidence from the jury's consideration of what petitioner's punishment should be. Although no longer directly at issue, the capital defendant's guilt or innocence continues to be a critical variable in the equation of aggravating and mitigating circumstances. "In at least some capital cases, the defendant might benefit at the sentencing phase of trial from the jury's 'residual doubts' about the evidence presented at the guilt phase ... As several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or whimsical doubts about the evidence so as to bend them to decide against the death penalty." *Lockhart v. McCree*, 476 U.S. at 181, 106 S.Ct. at 1769. (Citations omitted.) To the extent that any of the jurors harbored some residual doubt about petitioner Brown's guilt, their suspicions were dispelled by counsel's closing argument.

Our system counts on the adversarial process to produce just results. Petitioner's counsel acted less like an adversary and more like an advocate for the state when he made his unsolicited and unassented to declaration of petitioner's guilt during the sentencing proceeding. By effectively assisting the state in convincing the jury that death was the appropriate sentence, counsel caused a breakdown in the adversarial process that rendered the outcome of the sentencing proceeding unreliable and thereby violated petitioner's Sixth Amendment right to the effective assistance of counsel.

B. *Petitioner received ineffective assistance of counsel when counsel conceded the existence of aggravating factors without petitioner's consent.*

■■■ Two aggravating factors were submitted to the jury during sentencing. On the issue whether the murder was heinous, atrocious or cruel, Mr. Griffin argued, "I think you're going to answer that issue 'yes'." (Record at 1751.) The second issue was whether the murder was part of a course of conduct involving violence to another person. Defense counsel argued, "Once again, I don't think there is any question you're going to answer it 'yes'." Record at 1751.

As discussed above, *see supra* Section IV(A), the decision whether to hold the government to its burden of both proving guilt beyond a reasonable doubt and persuading the jury that death is the appropriate sentence belongs to the criminal defendant. By conceding the existence of both aggravating factors without petitioner's knowledge or consent, counsel admitted facts that were tantamount to conceding guilt, and removed those two critical elements of the state's case for the death penalty from contention. Counsel's failure to consult with petitioner about conceding the existence of the two aggravating circumstances cannot be reduced to a reasonable trial strategy. Rather, counsel's failure to consult with petitioner about this fundamental decision was inexcusable and constituted ineffective assistance of counsel.

### C. Counsel's presentation of alternative theories of defense was sound trial strategy.

▇▇▇ Petitioner contends that his trial counsel's presentation of two inconsistent theories of defense—petitioner was innocent, or if he did commit the crimes he did so while he was drunk—was not the result of reasonable, professional judgment. I disagree.

There is nothing particularly unusual or unconstitutional about going to the jury on two different theories of defense, particularly where a man's life is at stake. There was substantial evidence that on the night of the murders, petitioner had been drinking. Counsel argued that if petitioner was as intoxicated as some of the testimony indicated, petitioner must have been too drunk to be the culprit. Record at 1491. Counsel also argued that as a result of his intoxication, petitioner could not remember where he was on the morning in question, and that had he been at the victim's apartment and committed the murders, his state of intoxication prevented him from forming the specific intent required for a conviction of first-degree murder. Counsel requested that the jury be instructed on the claim of intoxication. Record at 1429, 1575. These defenses that counsel put forward were unsuccessful, but not unreasonable. Counsel's presentation of alternative theories of defense did not constitute ineffective assistance of counsel.

### D. The state did not render defense counsel ineffective as a matter of law.

▇▇▇ Petitioner contends that the state interfered with defense counsel's efforts to investigate the case and thereby rendered counsel ineffective as a matter of law. As examples of the way in which the state interfered with counsel's investigation of the case, petitioner points to the state's (1) refusal to allow counsel to view the witness scene; (2) refusal to conduct a probable cause hearing; (3) not allowing police officers to talk with defense counsel; and (4) moving a witness during trial.

The state violates the right to effective assistance of counsel when it interferes with the ability of counsel to conduct the defense. *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063–64. Such interference is presumed when the state's conduct causes an actual breakdown of the adversarial process. *Cronic*, 466 U.S. at 657, 104 S.Ct. at 2046.

"Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.... Only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Cronic* at 660, 662, 104 S.Ct. at 2047, 2048–49.

To the extent that the state interfered with counsel's investigation of this case, the interference was not of a sufficient magnitude to give rise to the presumption that the adversarial process broke down. *See supra* Sections IV(A) and (B). Petitioner did not have a constitutional right to a probable cause hearing, *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); the fruits of the police officers' investigation and the evidence seized from the crime scene were made known to the petitioner through discovery; and the witness who was allegedly moved during trial to avoid an interview with defense counsel wound up being called as a witness by the defense in its case in chief. Petitioner has not pointed the court to any specific errors made by trial counsel that were caused by the alleged interference with the case investigation and which rendered trial counsel's assistance ineffective.

### V

### CLAIMS RELATING TO THE PENALTY PHASE

Having already decided that petitioner is entitled to a new sentencing trial because

he received ineffective assistance of counsel during the first sentencing trial, and that unless the prosecutor comes forward with a neutral explanation for his actions, he is also entitled to a new sentencing trial because of the manner in which the state exercised its peremptory challenges, the court declines to consider the ten additional claims raised by petitioner that relate to the penalty phase.

## VI

## OTHER CLAIMS

Petitioner contends that his rights secured by the Eighth and Fourteenth Amendments were violted because of the discriminatory application of the death penalty against blacks convicted of killing whites. This theory was recently rejected by the United States Supreme Court in *McClesky v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Petitioner also maintains that his constitutional rights were violated by submission of the case to the jury, particularly the charge of first-degree murder due to premeditation and deliberation. This assertion is incorrect, as there was sufficient evidence of premeditation and deliberation under state law to permit a rationally motivated juror to find petitioner's guilt beyond a reasonable doubt, as required by *Jackson v. Wyoming,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

## VII

## CONCLUSION

As discussed above, the penalty phase of petitioner's trial was adversely affected by the ineffectiveness of counsel and by the state's use of its peremptory challenges to exclude all potential jurors who expressed some opposition to capital punishment. The combined effect of these constitutional errors rendered the penalty phase of petitioner's trial fundamentally unfair.

David Junior Brown's petition for a writ of habeas corpus is ALLOWED, subject to the state's granting him a resentencing

hearing, in accordance with N.C.G.S. § 15A-2000.