2003 WY 115

**Justin SINCOCK, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 02–4.

Supreme Court of Wyoming.

Sept. 12, 2003.

Representing Appellant: Kenneth M. Koski, State Public Defender; and Donna D. Domonkos, Appellate Counsel.

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1]   Justin Sincock appeals from convictions for first-degree premeditated murder, first-degree felony murder, aggravated robbery, forgery, and escape.   He claims (1) his right not to be twice placed in jeopardy was violated when he was sentenced to life for first-degree murder and twenty-two to twenty-five years for aggravated robbery, (2) error in the admission of a cellmate's testimony concerning statements he made while in jail, (3) abuse of discretion in the denial of his motion for continuance, and (4) ineffective assistance of counsel.   We find no error warranting reversal under the particular facts of this case and affirm.

## ISSUES

[¶ 2]   Mr. Sincock raises the following issues:

### ISSUE I

Whether Mr. Sincock's right to be free from double jeopardy was violated when the trial court sentenced Mr. Sincock to life for first degree murder and twenty-two

to twenty-five years for aggravated robbery?

*ISSUE II*

Whether the trial court abused its discretion when it allowed Mr. Burke to testify regarding statements made to him by Mr. Sincock after Mr. Burke was placed in Mr. Sincock's jail cell for the specific purpose of obtaining incriminating statements?

*ISSUE III*

Whether the trial court abused its discretion when it failed to grant a continuance of the trial after the lead counsel had to withdraw because of a conflict?

*ISSUE IV*

Whether Mr. Sincock received ineffective assistance of counsel when his counsel was unprepared to go to trial and when counsel conceded guilt?

The state presents substantially the same issues.

### FACTS

[¶ 3]  In the summer of 1998, Mr. Sincock was a transitional resident inmate at Community Alternatives of Casper (CAC). As a condition of his admission to CAC, Mr. Sincock was required to maintain employment and, in late June of 1998, was hired by Dan Horkan to work as a laborer for his floor covering business. On July 28, 1998, Mr. Horkan was scheduled to work out of town and told Mr. Sincock he would not be needed. Before heading out of town that morning, Mr. Horkan stopped by his house where he found Mr. Sincock. Mr. Horkan's wife, Becky, told her husband she had some painting Mr. Sincock could do at the house. Mr. Horkan left at approximately 10:00 a.m., leaving Mr. Sincock, Becky, and the Horkans' two children at the house.

[¶ 4]  At approximately 11:00 that same morning, Becky dropped the children off at her mother's house while she went to deliver lunch to Mr. Sincock. She planned to return to her mother's house before noon. When Becky did not return as planned, her mother, Jennie Litke, called the Horkans' house but

received no answer. When nothing was heard from Becky by mid-afternoon, Mrs. Litke called Carmen Horkan, Becky's mother-in-law, and asked her to go over and check the house. Mrs. Horkan went to the house about 3:00 p.m., stepped inside, called for Becky and, hearing no response, picked up the telephone to call Mrs. Litke. There was no dial tone, so she drove to Mrs. Litke's home to tell her she did not find Becky. Mrs. Horkan then returned to the Horkan residence with Mrs. Litke's daughter-in-law. By this time, Mr. Horkan had arrived home. They told him Becky was missing, and the three of them searched the house for some clue as to Becky's whereabouts. Mr. Horkan discovered the telephone had been dismantled. They found a bloodstained towel on the dining room floor. Mrs. Horkan went into the upstairs bathroom, pulled back the shower curtain, and found Becky's body lying face down in the bathtub. She had been shot in the head at close range.

[¶ 5]  Several items were missing from the home, including Becky's purse containing keys, cash, checkbook, and credit cards, a 1995 Saturn station wagon, and a .22 caliber revolver. A note left on the front door stated, "Dan, went to Mountain View, Justin." On July 31, 1998, members of Mr. Sincock's family notified police in Columbia, Missouri, where they resided, that Mr. Sincock had checked into a hotel in town. Police arrested him and recovered the stolen car, along with the stolen credit cards and checks.

[¶ 6]  Mr. Sincock was charged with first-degree premeditated murder, first-degree felony murder, aggravated robbery, forgery, and escape. The latter two charges were based upon allegations that Mr. Sincock forged a check taken from Becky's purse on the day of the murder and violated the terms of his placement at CAC. After a jury trial, he was convicted on all counts. He was sentenced to a term of life imprisonment on the first-degree murder conviction and consecutive terms of twenty-two (22) to twenty-five (25) years imprisonment on the aggravated robbery conviction, nine (9) to ten (10) years on the forgery conviction, and nine (9) to ten (10) years on the escape conviction.

## DISCUSSION

### A. Double Jeopardy

[¶ 7] Mr. Sincock claims his right against double jeopardy was violated when he was sentenced to life imprisonment for first-degree murder and a term of years for aggravated robbery. Citing *Bilderback v. State*, 13 P.3d 249, 254 (Wyo.2000), he contends these two convictions should have merged for sentencing purposes because the facts necessary to prove aggravated robbery describe the only possible way in which he could have committed felony murder (for which aggravated robbery was the underlying felony) and so sentencing him for both violated his constitutional rights against double jeopardy. To support his claim, Mr. Sincock relies upon cases in which we held the imposition of multiple punishments for felony murder and the underlying felony violated the Double Jeopardy Clauses of the United States and Wyoming Constitutions. *Mares v. State*, 939 P.2d 724 (Wyo.1997); *Roderick v. State*, 858 P.2d 538 (Wyo.1993); *Cook v. State*, 841 P.2d 1345, 1352–53 (Wyo. 1992).

[¶ 8] In *Cook*, the jury convicted the defendant of felony murder and the underlying felony and the trial court imposed separate sentences for each conviction. We reversed, holding the sentences must merge because the Wyoming legislature did not intend to allow punishment for both the murder and the underlying felony and, applying *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), proof of aggravated robbery under the Wyoming statute required proof of no additional element which proof of felony murder did not require. Mr. Sincock's convictions differ from those in *Cook* or any other case this Court has considered because the first-degree murder count was based on the alternate theories of premeditated murder and felony murder. In light of the jury's finding of guilt on both of those theories, the question of whether the aggravated robbery conviction violated Mr. Sincock's right to be free from a second punishment for the same offense is a question of first impression in Wyoming.

[¶ 9] We have said the Double Jeopardy Clause protects an accused by prohibiting (1) a second prosecution for the same offense after an acquittal, (2) a second prosecution for the same offense after a conviction, and (3) multiple punishments for the same offense. *DeLoge v. State*, 2002 WY 155, ¶ 7, 55 P.3d 1233, ¶ 7 (Wyo.2002). In this case, we are concerned with the third protection—multiple punishments for the same offense—and whether the convictions for first-degree murder and aggravated robbery should have merged for sentencing purposes. When we analyze the protection against double jeopardy in terms of multiple punishments, we apply the statutory elements test set forth in *Blockburger*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. Succinctly stated, that test is as follows: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Pope v. State*, 2002 WY 9, ¶ 15, 38 P.3d 1069, ¶ 15 (Wyo.2002); *Lee v. State*, 2001 WY 129, ¶ 20, 36 P.3d 1133, ¶ 20 (Wyo. 2001).

[¶ 10] Initially, application of the statutory elements test in order to resolve the issue of merger would appear to be a pure question of law calling for de novo review of the trial court's conclusions. *Bilderback*, 13 P.3d at 253–54. Such an analysis may indeed suffice when the question of merger concerns the entitlement of the state to *charge* a defendant with separate crimes and have each charge submitted to the jury. *Id.* The question of merger as a bar to multiple *sentences* after conviction of charges arising from the same act, however, summons a more complex appellate standard of review. *Id.*

[¶ 11] As a practical matter, in appeals alleging imposition of multiple sentences for a single act, the focus is on those facts proven at trial. *Chapman v. State*, 2001 WY 25, ¶ 25, 18 P.3d 1164, ¶ 25 (Wyo. 2001). The ultimate question is whether those facts reveal a single criminal act or multiple distinct offenses against the victim. *Id.* Where the acts required for the commission of one offense are a necessary and indis-

pensable precursor to commission of a second offense, the offenses merge for purposes of sentencing. *Id.* Such merger is mandatory where the second offense cannot be committed absent commission of the first offense. *Id.* If the statutory elements test reveals disparate component parts to the two charged offenses, it may be presumed that the legislature intended separate or cumulative punishments upon convictions of both. *Bilderback,* 13 P.3d at 253. With these principles in mind, we turn to the specifics of the charges on which Mr. Sincock was convicted and sentenced.

[¶ 12] Mr. Sincock was charged with one count of first-degree murder under Wyo. Stat. Ann. § 6–2–101 (Lexis 1999) (amended 2001), which provided in part as follows:

> (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any . . . robbery . . . kills any human being is guilty of murder in the first degree.

> (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law. . . .

The information filed against Mr. Sincock alleged one count of first-degree murder under § 6–2–101, based alternatively upon premeditation *or* murder committed in the course of a felony:

### COUNT I

> That JUSTIN WALKER SINCOCK, late of the county aforesaid, on or about the 28th day of July, 1998, in the County of Natrona, in the State of Wyoming, did unlawfully, purposely and *with premeditated malice, or in the perpetration of,* or attempt to perpetrate *a robbery* did kill a human being, to-wit: REBECCA HORKAN, in violation of W.S.1977, as amended, § 6–2–101.

(Emphasis added.) Mr. Sincock was also charged with aggravated robbery under Wyo. Stat. Ann. § 6–2–401(a) and (c) (Lexis-Nexis 2003):

> (a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:

> (i) Inflicts bodily injury upon another; or

> . . .

> (c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:

> (i) Intentionally inflicts or attempts to inflict serious bodily injury; or. . . .

The information alleged one count of aggravated robbery as follows:

### COUNT II

> That JUSTIN WALKER SINCOCK, late of the County aforesaid, on or about the 28th day of July, 1998, in the County of Natrona, in the State of Wyoming, did unlawfully in the course of committing the crime of larceny, did inflict bodily injury upon another, to-wit: REBECCA HORKAN; or did threaten another, to-wit: REBECCA HORKAN, with or intentionally put her in fear of immediate bodily injury, and did in the course of committing the crime of robbery intentionally inflict serious bodily injury; or did use or exhibit a deadly weapon, in violation of W.S.1977, as amended, § 6–2–401(a)(c).

[¶ 13] At the close of the evidence, the trial court instructed the jury on the elements of the charges and, with respect to the murder charge, quoted the statutory language defining first-degree murder alternatively as either premeditated murder or felony murder. The verdict form provided to the jury, however, separated first-degree premeditated murder and first-degree felony murder and required the jury to make a separate finding of guilty or not guilty for each alternative. In advocating for this particular verdict form, the state specifically argued the desirability of having the jury reach a separate verdict on each alternative so that, in the event of an appeal, it would be clear which alternative theory formed the basis for any first-degree murder conviction. Thus, this is not a case like others we have reviewed recently in which the basis for the conviction is unclear. *Urbigkit v. State,* 2003 WY 57, 67 P.3d 1207, (Wyo.2003); *May v. State,* 2003 WY 14, 62 P.3d 574 (Wyo.2003);

*Tanner v. State,* 2002 WY 170, 57 P.3d 1242 (Wyo.2002). Here, the state offered, and the trial court gave, a special interrogatory verdict form requiring the jury to indicate which theory formed the basis for the conviction.

[¶ 14] After its deliberations, the jury found Mr. Sincock guilty of both first-degree premeditated murder and first-degree felony murder. The jury also found him guilty of aggravated robbery. The trial court then imposed one sentence of life imprisonment for first-degree murder and a sentence to a term of years for aggravated robbery. Under the *Blockburger* analysis, first-degree premeditated murder requires proof of premeditated malice; aggravated robbery does not require proof of malice; the jury expressly found Mr. Sincock guilty of first-degree premeditated murder; therefore, we hold that merger of the sentence to life imprisonment on the first-degree murder conviction and the sentence to a term of years on the aggravated robbery conviction was not required.

## B. Testimony of Cellmate

[¶ 15] Byron Burke was a resident at CAC in June and July of 1998 and was acquainted with Mr. Sincock. On July 28, 1998, the day Becky was murdered, Mr. Burke was at the Horkan residence briefly at Mr. Sincock's request. He provided a statement to law enforcement concerning his contact with Mr. Sincock at CAC and on the day of the murder. That statement is not at issue here.

[¶ 16] In addition to his contact with Mr. Sincock when both men resided at CAC, Mr. Burke was also an inmate at the detention center at the same time Mr. Sincock was incarcerated and awaiting trial for Becky's murder. In August of 1998, because of disciplinary problems, Mr. Burke was transferred to the part of the detention center where Mr. Sincock was being held. When Mr. Sincock saw Mr. Burke on the day he was transferred, he told Mr. Burke he needed to talk to him about what happened on July 28, 1998 because they needed to get their stories straight. Mr. Burke contacted a police detective who then came to the jail and met with him. Mr. Burke told the detective that if he were moved to Mr. Sincock's cell, he could try to get information from him about the murder. The detective informed Mr. Burke that would make him an informant and an agent of the state and, as such, he would be required to advise Mr. Sincock of his rights before attempting to get information from him. The detective did not seem interested in having Mr. Burke act as an informant nor did he ask Mr. Burke to be an informant, do anything to get information from Mr. Sincock or move into Mr. Sincock's cell. Mr. Burke then filled out a written request asking to be placed in Mr. Sincock's cell. He stated in the request: "I was supposed to testify against him in court about that murder, and the detectives want me in there to find out as much as possible since we still get along." In fact, no one from the police department asked Mr. Burke to move into Mr. Sincock's cell. Mr. Burke testified that he made the request because he thought if he obtained information from Mr. Sincock helpful to the police, he might not have to go to prison. Some time after the written request, Mr. Burke was moved into Mr. Sincock's cell and Mr. Sincock made incriminating statements to him. Mr. Sincock argues the testimony of Mr. Burke concerning the statements he made to him should have been suppressed. In support of his claim, he cites cases holding the right to counsel is violated when the state creates a situation likely to induce a defendant to make incriminating statements without counsel present.

[¶ 17] The testimony from Mr. Burke to which Mr. Sincock takes exception was:

Q Okay. What did Mr. Sincock tell you had happened?

A He told me—one day I was sitting on my bed, and he told me that it was a rush and—out of the blue, and I said, "What was?" And he said, "shooting her." And I had said that—I just sat there, and he just went on and said he wanted to see my newspaper clippings about the shootings.

And they had said that she was shot in the back of the head, and he said that was a lie, that she was shot in the side of the head and that he had freaked out after he did it and threw her body in the bathtub over some toys, because he was too impa-

tient to remove them. And he freaked out, took her car, took her check and cashed it and went to CY Taco Bell and tried getting another C.A.C. resident to go with him.

Q Okay. During the time that he's telling you what he did and how that went, what was his demeanor then in this cell?

A He was laughing.

Q Okay. Did he show any remorse?

A No.

Q Did he seem upset?

A No.

Q Okay. When Mr. Sincock talked about the murder of Rebecca Horkan, did he say anything about what his plans were regarding the rest of the Horkan family?

A Yes, he did.

Q What did he say?

A He planned on killing the boss to begin with, but the boss was out at Alcova or wherever. And the kids were supposed to come back with her, and he was going to kill her and then kill the boss and kill the kids. He was going to kill the family.

According to Mr. Burke's testimony, Mr. Sincock offered these statements voluntarily, without any solicitation on his part. After Mr. Burke was transferred out of Mr. Sincock's cell, he contacted his attorney and asked him to let law enforcement know he had information for them. Law enforcement officers contacted him and he gave a statement to the same effect as the testimony quoted above.

[¶ 18] Prior to trial, Mr. Sincock moved for suppression of Mr. Burke's testimony, arguing that admission of the testimony would violate his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. After a hearing, the trial court denied the motion, concluding there were no constitutional violations because the undisputed evidence showed Mr. Burke was not acting as an agent of the state when Mr. Sincock made the incriminating statements to him and Mr. Sincock's statements to Mr. Burke were voluntary and not the result of interrogation or questioning by law enforcement.

[¶ 19] We apply a de novo standard of review to claims of constitutional violations. We also review *de novo* trial court rulings on a defendant's motion to suppress statements on grounds of involuntariness. *Edwards v. State*, 973 P.2d 41, 48 (Wyo.1999). We defer to the trial court's findings of fact unless they are clearly erroneous, and, because the trial court is in the best position to hear the evidence and assess the witnesses' credibility, we view the evidence in the light most favorable to its ruling. *Hadden v. State*, 2002 WY 41, ¶ 17, 42 P.3d 495, ¶ 17 (Wyo.2002).

[¶ 20] In claiming his statements to Mr. Burke were improperly admitted, Mr. Sincock relies primarily on *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), in which the United States Supreme Court held that incriminating statements made by the defendant to a paid informant while they were confined in the same cellblock were improperly admitted. In *Henry*, government agents contacted a cellmate of the defendant who had also been a paid government informant for over a year and, while telling him not to initiate conversation with the defendant, told him to be alert to anything the defendant said. In deciding that a government agent deliberately elicited incriminating statements from the defendant in violation of the protections of the Sixth Amendment, the court found three factors to be important: (1) the informant was acting under instructions as a paid informant of the government, (2) the agent was ostensibly no more than a fellow inmate of the defendant, and (3) the defendant was in custody and under indictment at the time of the statements. *Henry*, 447 U.S. at 270, 100 S.Ct. 2183. The court said:

By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel. This is not a case where, in Justice Cardozo's words, "the constable ... blundered," *People v. DeFore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926); rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.

*Id.* at 274–75, 100 S.Ct. 2183 (footnote omitted).

[¶ 21] Unlike the situation in *Henry*, the evidence in the present case was that Mr. Burke was not acting under instructions from government officials and was not a government informant, paid or unpaid, at the time Mr. Sincock made the statements. Rather, the evidence was that Mr. Burke was acting on his own and in direct contravention of what police detectives told him.

[¶ 22] Moreover, in cases subsequent to *Henry*, the United States Supreme Court has further clarified a Sixth Amendment violation does not occur in this context if the incriminating statements made by a defendant to an informant are voluntary. In *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the defendant was placed in a cell with a prisoner who, unbeknownst to him, was a police informant who had agreed to listen to his conversations and report his remarks back to detectives. The informant was instructed not to ask the defendant any questions but only to listen. The defendant thereafter made incriminating statements, which the informant reported back to detectives. The court considered the question, left open in *Henry*, whether the Sixth Amendment forbids the admission into evidence of an accused's statements to a jailhouse informant who was placed in close proximity but made no effort to stimulate conversations about the crime charged. The court concluded the answer was "no":

> [A] defendant does not make out a violation of [the Sixth Amendment right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459, 106 S.Ct. 2616. Here, there was no evidence the police or Mr. Burke took any action designed deliberately to elicit incriminating remarks from Mr. Sincock. We conclude, therefore, the trial court did not error in admitting Mr. Burke's testimony.

[¶ 23] Having reached that conclusion, we note our concern that Mr. Burke was ever allowed to become ·Mr. Sincock's cellmate. The suggestion that Mr. Burke's transfer into Mr. Sincock's cell was not known to the police and that detention center personnel did not know of Mr. Burke's request to be moved to that location in order to get information for the government stretches the bounds of belief. However, case law from other jurisdictions overwhelmingly holds that an informant becomes a government agent so as to implicate the government in a right to counsel violation only when the government gives explicit directions or otherwise encourages the informant to obtain information. Given the undisputed evidence presented here that the government attempted to discourage Mr. Burke's offer to obtain information, our concern about Mr. Burke's placement in Mr. Sincock's cell does not warrant reversal of the trial court's ruling.

## C. Motion for Continuance

[¶ 24] Mr. Sincock claims error occurred when the trial court denied his motion for continuance filed after lead defense counsel withdrew due to a conflict. Apparently, lead counsel became involved in representation of another jail inmate who had knowledge of evidence the state intended to present at Mr. Sincock's trial. He withdrew leaving two lawyers to defend Mr. Sincock at trial—one with only three years experience and a second who intended to be involved only if the case entered the penalty phase. At the time lead counsel withdrew, less than two weeks remained to prepare for trial.

[¶ 25] The grant or denial of a motion for continuance is a discretionary ruling. *Clearwater v. State*, 2 P.3d 548, 553 (Wyo.2000). We, therefore, review the trial court's ruling on Mr. Sincock's motion for continuance for abuse of discretion. The ultimate question in determining whether an abuse of discretion has occurred is whether the trial court reasonably could have concluded as it did. *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998). Review of a court's discretionary ruling on a continuance motion is highly dependent upon individual facts and circumstances. *Cardenas v. State*, 811 P.2d

989, 994 (Wyo.1991). The party attacking the court's ruling bears the burden of establishing the abuse of discretion. *Id.* Where a trial court refuses to grant a continuance requested on the basis of insufficient time to prepare for trial, an abuse of discretion will not be found unless there is a clear showing of manifest injustice. *Mapp v. State*, 953 P.2d 140, 143 (Wyo.1998).

[¶ 26] The record reveals that defense counsel filed a motion for continuance on September 16, 1999, in which he presented three reasons for extending the trial date, including the fact that lead defense counsel was withdrawing from representation of Mr. Sincock. Mr. Sincock's claim of error on appeal relates exclusively to the withdrawal of counsel and not to the other reasons originally advanced as grounds for a continuance. At the time the motion was filed, the trial was scheduled to begin on September 27, 1999, less than two weeks away. A hearing was held on the motion the following day, September 17, 1999, at which time defense counsel argued that the only attorney really prepared to try the case was about to withdraw from representation of Mr. Sincock. While noting its concern about the events giving rise to lead defense counsel's withdrawal, the trial court denied the motion, stating:

> Balancing out and considering everything, though, it seems to me the State is also entitled to a trial and an ability to go on with this case. The expense and the effort in administering these trials is unbelievable to my perception. And the Clerk of District Court's Office, the District Judges' Office have gone through tremendous efforts to have this case scheduled up for trial beginning September 27, 1999.

> And to just continue it at no fault of the Court, no fault of the State, perhaps some fault directed to the defendant and maybe to defense counsel, to me, just doesn't pan out. It seems to me that we do need to leave the trial on. . . .

> The next thing I would note is, while the defense may want to set this case in January, our trial schedule is such that, once again, we would have to take drastic efforts to schedule it at a time convenient to the defense.

> We have people, for example, in civil trials that have been waiting for, I'm guessing, ten months. Their civil trials in January are set ten months ago. And to say, okay, we'll just throw them another ten months down the road—or will the court be unable to address speedy trial concerns in other criminal cases—it just doesn't sit with me.

> And given the fact that there's been a previous continuance granted based upon the defense's desire to change the plea to not guilty by reason of mental illness and deficiency, I just can't justify another continuance in this case. So I'll stand by the ruling.

[¶ 27] On September 23, 1999, four days before trial, defense counsel filed a motion asking the trial court to reconsider, on different grounds, its denial of the September 16 motion for continuance. In this third motion for continuance, defense counsel did not raise the issue of lead trial counsel's withdrawal as grounds for continuing the trial. After a hearing, the trial court again denied the motion.

[¶ 28] Mr. Sincock argues in essence that it was error for the trial court to deny his motion because it denied him the right to a fair trial with competent, adequately prepared counsel. He claims that after lead counsel withdrew, he was left to be represented by an inexperienced attorney whose function up to then had been to assist lead counsel, and an attorney, who although experienced, had focused up to that point on the penalty phase of the trial. Given the seriousness of the charges against him and the potential death sentence, he argues, a continuance was warranted in order to give the two remaining attorneys time to adequately prepare.

[¶ 29] There is no question the charges against Mr. Sincock were serious. However, the seriousness of the charges or the penalty is not the determining factor in deciding whether the denial of a continuance can be upheld. Rather, we look to whether the denial resulted in a serious miscarriage of justice. *Mapp*, 953 P.2d at 143. Under

the circumstances present in this case, we find no such miscarriage of justice.

[¶ 30] Although the attorney Mr. Sincock characterizes as "lead" counsel did not appear at the trial and handle Mr. Sincock's defense, the attorneys left with the defense after his withdrawal had the benefit of his work gathering evidence and witnesses and preparing a defense from the time he entered his appearance at the arraignment on September 22, 1998, a full year before trial, until he withdrew two weeks before trial. All of the information he gathered and all of his preparations for trial were available to the two remaining attorneys after his withdrawal.

[¶ 31] Moreover, this is not a situation where two unseasoned attorneys were thrust suddenly into defending Mr. Sincock with no previous involvement in or knowledge of the case. Both attorneys became involved in the case early on in the proceedings.[1] Although one of them was fairly new to the practice of law, she was intimately involved from the beginning, filing many of the pretrial defense motions and arguing them before the court. Her general knowledge of the case is apparent from a review of the filings and hearing transcripts. The other attorney was an experienced lawyer and former judge with thirty years of experience in the legal profession. It appears from the record that he also was actively involved in the defense from the beginning and appeared at hearings, argued motions, and was well versed in the facts and law of the case. Although his focus may have been the sentencing phase of the proceedings, it appears from the record that he also was involved in other aspects of the defense, including estimating the number of days necessary for trial, discovery issues, jury questionnaires, issues concerning Mr. Sincock's mental competency, adding an additional plea of not guilty by reason of mental deficiency and the motion to suppress the statements and testimony of Mr. Burke. Additionally, he was present at and participated in many of the hearings leading up to the trial.

[¶ 32] Despite these facts, Mr. Sincock argues he did not receive a fair trial because defense trial counsel was unprepared for the state's cross-examination of the defense expert witness using a chronology prepared by the defense summarizing records, including jail disciplinary reports involving Mr. Sincock. Dr. Jakob Camp, a clinical forensic psychiatrist retained by the defense, performed a mental capacity evaluation of Mr. Sincock. Dr. Camp testified, based upon his examination of Mr. Sincock and review of his records and history, that in his opinion Mr. Sincock suffered from a severely abnormal mental condition resulting from Hashimoto's disease exacerbated by methamphetamine use, which grossly impaired his understanding of reality and made it impossible for him to conform his conduct to the requirements of law on July 28, 1998. One of the points the defense attempted to make during the trial was that Mr. Sincock did not have a violent nature or a history of violent behavior, a fact inconsistent, in the opinion of Dr. Camp, with the crime he was alleged to have committed. In an attempt to defuse this idea, the state on cross-examination of Dr. Camp used the chronology, which made reference to various disciplinary reports and alleged outbursts involving Mr. Sincock, conflicts with other inmates and confiscation of items found in his possession that could potentially be used as weapons. Defense counsel objected on the basis that the reports concerned allegations that were never proven and the state knew they were never proven and was misleading the jury. The trial court allowed the examination to continue and the state asked Dr. Camp about actual disciplinary action taken against Mr. Sincock while in jail. Defense counsel asked to approach the bench and told the trial court he did not know where the information in the chronology came from and his lack of knowledge was one of the problems with lead counsel withdrawing and the trial going forward as scheduled. He asked for a break to consult with co-counsel, which the court denied, saying defense counsel could make inquiry of the

---

1. Kerri Johnson entered an appearance on behalf of Mr. Sincock on November 12, 1998. Although we are unable to locate an entry of appearance for him, James Wolfe appeared at the December 7, 1998, scheduling conference on Mr. Sincock's behalf and from that point on was actively involved in the defense.

witness on redirect and if he still needed a break at that point, the court would consider it. The state concluded its cross-examination, and on redirect, defense counsel inquired of Dr. Camp whether any of the information he reviewed, including the reports of disciplinary problems in jail, demonstrated to him that Mr. Sincock was a violent individual. Dr. Camp testified that it did not. Defense counsel completed his re-direct examination and did not renew his request for a recess in order to review the chronology or discuss it with Dr. Camp or the defense team. In light of the totality of Dr. Camp's testimony, as well as the other evidence presented at trial, we are not persuaded defense counsel's apparent lack of knowledge of the chronology caused a serious miscarriage of justice resulting in the denial of Mr. Sincock's right to a fair trial. Mr. Sincock points to no other specific facts demonstrating a serious miscarriage of justice resulting from the denial of his motion for continuance. We hold, therefore, he has failed to demonstrate an abuse of discretion.

## D. Ineffective Assistance of Counsel

[¶ 33] Mr. Sincock argues defense counsel was ineffective in two respects: being unprepared for trial and conceding his guilt in remarks made to the jury. The first claim is based upon the same facts as those alleged in his claim that a continuance of the trial was wrongly denied—trial counsel was not prepared to defend his case after lead counsel withdrew. The second claim is based upon two statements by defense counsel, one in opening statement to the effect that Mr. Sincock denied the charges but the defense expert would testify Mr. Sincock was suffering from a medical condition that affected his memory, and another in closing argument conceding that Mr. Sincock probably committed the crime. We address these two claims separately in the order they were raised.

### 1. *Preparedness for trial*

#### (A) STANDARD OF REVIEW

[¶ 34] In reviewing claims of ineffective assistance of counsel, our paramount consideration is whether, in light of all the circumstances, trial counsels' acts or omissions were outside the wide range of professionally competent assistance. *Gleason v. State*, 2002 WY 161, ¶ 44, 57 P.3d 332, ¶ 44 (Wyo.2002). An appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Ordinarily, he must also demonstrate that prejudice resulted. Under this test, the inquiry is whether or not counsel rendered the assistance a reasonably competent attorney would have offered and, if not, whether his failure to do so prejudiced the defense of the case. *Id.* This two-part test, the *Strickland* test, is the test we normally apply in reviewing ineffectiveness claims, and it is this test that applies to Mr. Sincock's first claim of ineffectiveness.

[¶ 35] We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Gleason*, 2002 WY 161, 57 P.3d 332. We do not evaluate the efforts of counsel from a perspective of hindsight but endeavor to reconstruct the circumstances surrounding the challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. *Dickeson*, 843 P.2d at 609. We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. *Id.* The burden is on the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy. *Id.* With these standards in mind, we apply the two-part *Strickland* test to Mr. Sincock's claim that counsel was not prepared for trial.

(B) PART ONE OF *STRICKLAND*—DEFICIENT PERFORMANCE

[¶ 36] Mr. Sincock claims broadly that counsel's performance was deficient because he was unprepared for trial. The *only* specific example he cites is counsel's unfamiliarity with the chronology the state used in cross-examining Dr. Camp. Just as we concluded this occurrence was insufficient to demonstrate manifest injustice denying Mr. Sincock a fair trial, we conclude counsel's unfamiliarity with the chronology does not show deficient performance. Despite his uncertainty about the source of the information contained in the chronology, counsel made his point through Dr. Camp that there was no evidence Mr. Sincock had violent tendencies and the state was misleading the jury by suggesting disciplinary action was taken against Mr. Sincock while he was in jail. In light of all the other circumstances and counsel's overall performance at trial, this limited event is far from sufficient to show counsel was unprepared for trial.

[¶ 37] As pointed out, Mr. Sincock offers no other specifics as to counsel's alleged lack of preparedness. We have said that a defendant does not meet his burden of showing his counsel's performance was deficient by mere speculation or equivocal inferences. *Barkell v. State*, 2002 WY 153, ¶ 13, 55 P.3d 1239, ¶ 13 (Wyo.2002). A broad assertion of ineffective assistance, without more, is insufficient to overcome the presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* Contrary to Mr. Sincock's contention, we find from the totality of the circumstances that counsel was adequately prepared and performed within the bounds of reasonable professional judgment. Having reached this conclusion with respect to the first part of the *Strickland* test, we do not reach the second part of the test, the question of prejudice.

### 2. *Concessions of guilt*

(A) STANDARD OF REVIEW

[¶ 38] Although we ordinarily adhere to the *Strickland* test in reviewing claims of ineffective assistance of counsel and require a showing of deficient performance coupled with prejudice, there is a narrow class of cases where the "circumstances ... are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *see also Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The complete denial of counsel is one such circumstance. *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039. Another exists where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Still another exists where counsel is appointed so close to trial that it amounts to a denial of effective assistance. *Id.* Where such circumstances are shown to exist, prejudice will be presumed without inquiry into the actual performance at trial. *Id.* Wyoming recognizes this narrow line of cases in which prejudice is presumed. *Olsen v. State*, 2003 WY 46, ¶ 75, 67 P.3d 536, ¶ 75 (Wyo.2003) (citing *Herdt v. State*, 816 P.2d 1299, 1301–02 (Wyo.1991)).

[¶ 39] Among the many jurisdictions that have applied the *Cronic* test, a number, including Wyoming, have done so in cases involving a concession of guilt by the defendant's counsel. *Olsen*, 2003 WY 46, 67 P.3d 536. Such a concession, it is reasoned, constitutes a failure on the part of defense counsel to subject the prosecution's case to meaningful adversarial testing, the second circumstance described in *Cronic* in which prejudice may be presumed. Mr. Sincock asserts this line of cases applies in his case because defense counsel conceded his guilt in statements to the jury without his consent. If the statements about which he complains can be accurately described as concessions of guilt without consent, the *Cronic* standard applies. Otherwise, the *Strickland* test governs his ineffectiveness claim. Mr. Sincock points to two statements of counsel, set forth below in the context in which they were made. The particular portion about which he complains appears in italics.

[¶ 40] During opening statement, defense counsel made the following remarks:

[I]t's our burden to prove to you that this mental condition took place. We have to show you by a—the evidence of not beyond

a reasonable doubt, but we have to show you that there was a mental illness. . . .

. . .

Even if you find that the defendant did commit this event—*And I have to say—because he has still said that he didn't do it—he denies that he did it. The doctor will tell you that's because it's kind of an amnesia thing. He can't accept it.*

And as his lawyer, I have to tell you he says he didn't do it.

(Emphasis added). Defense counsel stated as follows in closing argument:

There are a few things that we know for sure about this case or that we can be certain of. We know that Justin Sincock will not or cannot tell us what happened. We know no—Because you will see it. It's in evidence. You have Dr. Merrell's report, and you know what Justin Sincock told him and told the police and others.

And basically what he said is that there was a third person that actually fired the shot that killed Mrs. Horkan. And he refuses to identify that man, because he fears that his family will be next.

And he has told a psychologist, who has taken the statement for Dr. Merrell—and it's in his report—that withholding that name he knows will probably result in his conviction for murder.

*And although, I have to tell you, that we just don't know for sure what happened that day, because there wasn't anybody there besides, you know, Mr. Sincock and Mrs. Horkan, I must admit and I will concede that it is most likely that it was Justin Sincock who probably committed this crime, whatever that crime might be.*

It's not my place, however, to say that the State has proven that beyond a reasonable doubt. I just can't tell you that. I mean, I am—I'm representing him, and he has not pled guilty to that. Whether or not that has been proven, you have to decide beyond a reasonable doubt.

But I want to talk to you about what I think this case is really about, even if you do come to that conclusion that it was

Justine Sincock who fired that fatal shot that killed Mrs. Horkan. Because there's a lot more to this case than just that. (Emphasis added). We address these comments of counsel separately.

### (B) OPENING STATEMENT

■ [¶ 41] Considering counsel's remark in opening statement in the context in which it was made, we do not find it to be subject to the *Cronic* standard of prejudice per se. Under the circumstances as they existed, defense counsel's statement to the effect that Mr. Sincock denied killing Becky, but in the event the jury did not believe him there was evidence from which a doctor concluded he was mentally ill and did not remember what occurred, is not the equivalent of a concession of guilt. Moreover, the statement was not made without Mr. Sincock's consent.

[¶ 42] Mr. Sincock initially entered a plea of not guilty. However, on April 23, 1999, just prior to the original trial date, he moved to enter an additional plea of not guilty by reason of mental illness or deficiency pursuant to Wyo. Stat. Ann. § 7–11–304(c) (LexisNexis 2003). At the hearing on his motion, Mr. Sincock was asked by the court whether he understood the motion and the court's ruling on the motion and desired to enter the plea. He responded affirmatively. From that point on, the defense strategy, with Mr. Sincock's express consent, was to hold the state to its burden of proving his guilt beyond a reasonable doubt while at the same time, in recognition of the overwhelming evidence against him, attempting to convince the jury in the event it believed he killed Becky that he was not mentally responsible for the act.

■ [¶ 43] The presentation of two different theories of defense, particularly where a man's life is at stake, is not unusual and does not constitute ineffective assistance of counsel. *Brown v. Rice,* 693 F.Supp. 381, 398 (W.D.N.C.1988). The key factor is whether or not the client has given his consent to such a strategy. *Nixon v. Singletary,* 758 So.2d 618, 623 (Fla.2000); *Haynes v. Cain,* 272 F.3d 757 (5th Cir.2001). Mr. Sincock expressed his desire to enter a plea

of not guilty by reason of mental illness or deficiency, thus giving his consent to the presentation of alternate theories. Additionally, as a practical matter, defense counsel's remarks in opening statement were not the equivalent of an attorney stating directly to a jury that his client is guilty of the crime charged. Therefore, the *Cronic* standard of prejudice per se does not apply.

[¶ 44] Under the *Strickland* analysis, given Mr. Sincock's plea of not guilty by reason of mental illness, defense counsel had no choice but to present the alternative theories consistent with his client's alternate pleas. That is precisely what he did in his opening remarks and his conduct in doing so did not fall below the range of reasonable competence. We, therefore, reject Mr. Sincock's claim of ineffectiveness as to the remarks made in opening statement.

#### (c) CLOSING ARGUMENT

[¶ 45] A careful review of the cases addressing concessions of guilt by counsel is necessary to resolve Mr. Sincock's claim that defense counsel's statements in closing argument were per se prejudicial. We look first at the most recent case from this jurisdiction addressing the issue.

[¶ 46] In *Olsen*, we considered whether defense counsel's strategic decision to admit that the defendant shot the victims and then use an intoxication defense to establish that he could not have formed the requisite intent for first-degree murder constituted ineffective assistance of counsel. We held the concession was tactically a reasonable attempt to avoid a first-degree murder conviction in light of Olsen's several confessions that he shot the victims. *Olsen*, 2003 WY 46, ¶ 76, 67 P.3d 536. In reaching this result, we cited *Nielsen v. Hopkins*, 58 F.3d 1331, 1335 (8th Cir.1995), in which the court "concluded that admitting the act but denying the requisite mental state by an intoxication defense to first degree murder charges is not the functional equivalent of a guilty plea." *Id.*

[¶ 47] Our holding in *Olsen* is not particularly helpful in resolving Mr. Sincock's claim because it was based in large part on Mr. Olsen's several confessions to having shot the victims. Unlike the facts before us in *Olsen*, Mr. Sincock denied shooting Becky. *Nielsen* likewise offers little guidance because it did not involve an attorney stating directly to the jury that his client committed the acts alleged. On that basis, the *Nielsen* court distinguished it from the line of cases upon which Mr. Sincock relies. We turn, therefore, to consideration of those cases.

[¶ 48] In *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504, 507 (1985), the defendant was charged with first-degree murder. He pleaded not guilty and claimed throughout the proceedings that he shot the victim in self-defense. In closing argument, defense counsel told the jury he had his own opinion of what happened and did not feel his client should be found innocent. *Id.* at 506. He said he thought his client should "do some time to think about what he has done" and the jury should find him guilty of manslaughter. *Id.*

[¶ 49] Applying *Cronic*, the court in *Harbison* held the defendant did not have to show any specific prejudice in order to establish his claim for ineffective assistance of counsel. The court said: "[W]hen counsel to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed." *Id.* at 507. The court concluded: "[I]neffective assistance of counsel, per se in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *Id.*

[¶ 50] In *People v. Hattery*, 109 Ill.2d 449, 94 Ill.Dec. 514, 488 N.E.2d 513 (1985), the defendant was charged with murder and pleaded not guilty. During opening statement, defense counsel stated:

"[H]e did it. He did everything the prosecution just told you.

. . .

We are not asking you to find [the defendant] not guilty. At the end of your deliberations, you will find him guilty of murder.... Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you,

will be whether to impose the death penalty on [the defendant] for trying to save the life of his family."

*Id.* at 516, 488 N.E.2d 513. In addition to these remarks, defense counsel also presented no evidence and made no closing argument. The defense was limited to attempting to show the defendant was compelled to kill the victim, a mitigating factor in death penalty cases in Illinois.

[¶ 51] In reviewing the defendant's claim for ineffective assistance of counsel, the court quoted *Cronic* as saying where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 517, 488 N.E.2d 513. The court concluded:

Counsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsels' strategy. We therefore hold that defendant was denied the effective assistance of counsel in violation of the sixth amendment.

*Id.* at 519, 488 N.E.2d 513.

[¶ 52] In *Brown,* another murder case in which the defendant maintained his innocence, defense counsel made the following statements to the jury during sentencing:

We are talking about what is going to happen to the man who did it, and that's all we're talking about.

We are debating a man's—whether a man shall live or die, and regardless of what [he] has done, he is a human being.

He may have committed a horrible crime and he did commit two horrible crimes, but he is still a human being with a soul despite the blackness of the crime that this man has committed.

693 F.Supp. at 395. In holding that counsel provided ineffective assistance, the court stated:

Our system counts on the adversarial process to produce just results. Petitioner's counsel acted less like an adversary and more like an advocate for the state when

he made his unsolicited and unassented to declaration of petitioner's guilt during the sentencing proceeding. By effectively assisting the state in convincing the jury that death was the appropriate sentence, counsel caused a breakdown in the adversarial process that rendered the outcome of the sentencing proceeding unreliable and thereby violated petitioner's Sixth Amendment right to the effective assistance of counsel.

*Id.* at 397.

[¶ 53] In *Nixon,* 758 So.2d 618, *State v. Carter,* 270 Kan. 426, 14 P.3d 1138 (2000), and *Haynes,* 272 F.3d 757, the courts similarly concluded that a concession of guilt by defense counsel without the defendant's consent was prejudicial per se and deprived the defendant of effective assistance of counsel. In all of the above cases, the defendant entered a straight not guilty plea. In *Carter* and *Haynes,* believing the evidence against their clients would result in a conviction, defense counsels' strategy was to attempt to direct the jurors away from a first-degree premeditated murder conviction. The defendants were not consulted about the strategy and unequivocally asserted their opposition when the strategy became apparent at trial. In *Nixon,* the court said:

We recognize that in certain unique situations, counsel for the defense may make a tactical decision to admit guilt during the guilt phase in an effort to persuade the jury to spare the defendant's life during the penalty phase. Of course, in such cases, the dividing line between a sound defense strategy and ineffective assistance of counsel is whether or not the client has given his or her consent to such a strategy.

758 So.2d at 623.

[¶ 54] Mr. Sincock's situation is distinguishable from the above cases in terms of the statements defense counsel made to the jury. In *Harbison,* 315 N.C. 175, 337 S.E.2d 504, defense counsel told the jury he thought his client should be found guilty of manslaughter and serve some time, thereby pursuing a strategy directly contrary to the position taken by the defendant that he was not guilty and shot the victim in self-defense.

Similarly, in *Hattery*, 109 Ill.2d 449, 94 Ill. Dec. 514, 488 N.E.2d 513, defense counsel informed the jury the defendant "did it" and at the end of deliberations would be found guilty of murder, remarks that were totally inconsistent with the defendant's not guilty plea. Defense counsel also presented no evidence and made no closing argument in *Hattery*, factors which the court considered in concluding counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. In *Brown*, 693 F.Supp. 381, counsel stated his client "did commit two horrible crimes." In *Nixon*, counsel conceded his client caused the victim's death and that "fact will be proved to your satisfaction beyond a reasonable doubt." *Nixon*, 758 So.2d at 620. In each of these cases, there is no question counsel conceded the defendant's guilt without consent and failed to put the state to its burden of proving guilt beyond a reasonable doubt.

[¶ 55] In contrast to the cases cited, Mr. Sincock's counsel did not tell the jury that his client "did it," should "serve some time" for what he did, would be found guilty, or committed a horrible crime or that the state met its burden of proof beyond a reasonable doubt. Rather, Mr. Sincock's counsel told the jury that his client denied killing Becky and pleaded not guilty to the charges, evidence would be presented refuting many of the state's claims and showing the state simply stopped looking for other suspects once it learned Mr. Sincock was at the Horkan residence on the day of the murder, Mr. Sincock said there was a third person present who fired the shot that killed Becky, the state had to prove beyond a reasonable doubt that Mr. Sincock killed Becky, and it was up to the jury to decide whether the state met its burden of proof beyond a reasonable doubt. In addition to these statements, defense counsel told the jury that the defense would present evidence showing Mr. Sincock did not have a history of violent behavior and, if it believed the state's evidence that he killed Becky, it was an event atypical of Mr. Sincock brought on by a period of psychosis resulting from thyroid disease compounded by use of methamphetamine the combined effect of which was that he could not conform his conduct to the requirements of law. In addition to all these statements, defense counsel told the jury it was Mr. Sincock "who most probably committed this crime, whatever that crime might be."

[¶ 56] Under the *Cronic* analysis, concessions of guilt by counsel are deemed per se prejudicial where such concessions amount to a failure on the part of defense counsel to subject the prosecution's case to meaningful adversarial testing. In the words of the *Brown* court, it is only where the record as a whole demonstrates that counsel acted less like an adversary and more like an advocate for the state that a breakdown in the adversarial process occurs rendering the outcome of the proceeding unreliable and violating the right to effective assistance of counsel. *Brown*, 693 F.Supp. 381. In each of the cases cited by Mr. Sincock and the others discussed above, the statements of counsel fairly can be said to constitute a failure to test the prosecution's case rendering the outcome unreliable. Considering the remark Mr. Sincock's counsel made in closing in the context in which it was made and in light of the totality of the defense he provided, we are not able to conclude that counsel failed to subject the prosecution's case to meaningful adversarial testing. In context, it is clear that, when counsel stated it was likely his client committed "the crime," he meant "the act." That meaning is obvious from the next sentence in his statement—"whatever that crime may be." Viewing the record as a whole, the statement simply does not demonstrate a breakdown in the adversarial process rendering the outcome of the proceeding unreliable. We hold, therefore, that the *Cronic* test does not apply to these facts and prejudice will not be presumed.

[¶ 57] With that conclusion, we are left to consider Mr. Sincock's claim under the *Strickland* analysis; that is, by making the remark that Mr. Sincock most likely committed the crime, did defense counsel fail to render the assistance a reasonably competent attorney would have provided and so undermine the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result? *Barkell*, 2002 WY 153, ¶ 9, 55 P.3d 1239. We reiterate that the reasonableness of counsel's

342

actions is evaluated from the perspective of counsel at the time and in light of all the circumstances of the case. *Lancaster v. State*, 2002 WY 45, ¶57, 43 P.3d 80, ¶58 (Wyo.2002). We further reiterate the strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. *Dickeson*, 843 P.2d 606.

[¶58] Based upon the totality of the circumstances appearing in the record before us, we are unable to conclude defense counsel's remarks to the jury so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. An objective assessment of counsel's performance reveals that he functioned as a reasonably competent advocate on behalf of Mr. Sincock in a very difficult case. Unlike the other cases involving comments by counsel about the defendants' guilt, defense counsel in this case had the task, with Mr. Sincock's express approval, of explaining alternative pleas—not guilty and not guilty by reason of mental illness or deficiency. This necessarily meant telling the jury that Mr. Sincock denied killing Becky, but if the jury did not believe his denial, there was evidence demonstrating he did not have the mental capacity to conform his conduct to the law. This is never an easy task for defense counsel, and while we do not condone counsel's choice of words here that Mr. Sincock most probably "committed the crime," under these particular facts we cannot conclude this isolated misstatement fell below standards of reasonable competency.

[¶59] Even if we were to conclude counsel's statement brought his conduct below that of a reasonably competent attorney, we could not conclude a reasonable probability exists that, but for counsel's error, the outcome of the trial would have been different. *Lancaster*, 2002 WY 45, ¶59, 43 P.3d 80. The evidence against Mr. Sincock was overwhelming. In addition to his undisputed presence at the Horkan residence on the day of the murder, testimony from a witness that he saw Mr. Sincock search for and find the .22 pistol in the Horkan's closet, and Mr. Sincock's arrest in the same state where the Horkan vehicle was located, the state also presented three witnesses who testified Mr. Sincock told them he was going to kill Mr. Horkan or the Horkan family and one witness who testified Mr. Sincock came to CAC on the afternoon of the murder in Becky's car, with a .22 pistol and said Becky was in the bathtub. Reviewing the whole record under the totality of the circumstances as they existed at the time of the trial, we find Mr. Sincock was provided with effective assistance of counsel.

[¶60] Affirmed.